UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NARDINO COLOTTI,                         :
                    Petitioner,          :
                                         :    11 Civ. 1402 (DLC)
          -v-                            :      04 Cr. 1110-02
                                         :
UNITED STATES OF AMERICA,                :
                    Respondent.          :
----------------------------------------X
PRENKA IVEZAJ,                           :
                    Petitioner,          :
                                         :    11 Civ. 1403 (DLC)
          -v-                            :      04 Cr. 1110-04
                                         :
UNITED STATES OF AMERICA,                :
                    Respondent.          :
----------------------------------------X
NIKOLA DEDAJ,                            :
                    Petitioner,          :
                                         :    11 Civ. 1510 (DLC)
          -v-                            :      04 Cr. 1110-03
                                         :
UNITED STATES OF AMERICA,                :    OPINION AND ORDER
                    Respondent.          :
----------------------------------------X

APPEARANCES:

For petitioner Nardino Colotti:
Beth Mina Farber
80 Pine Street
Suite 3302
New York, NY 10005

For petitioner Prenka Ivezaj:
Michael Steven Schachter
Alison Rose Levine
Jennifer Jill Greene
Willkie Farr & Gallagher LLP (NY)
787 Seventh Avenue
New York, NY 10019

1

For petitioner Nikola Dedaj:
Diarmuid White
White & White
148 East 78th Street
New York, NY 10021

For the United States of America:
Jennifer Gillum Rodgers
U.S. Attorney's Office, Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

DENISE COTE, District Judge:

These three petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2255 are brought by co-defendants who were convicted in 2006 following a fifteen-week jury trial. In an Opinion of December 21, 2011, the Court denied the petitions in part but reserved decision on several claims so that an evidentiary hearing could be held to investigate the petitioners' allegations of ineffective assistance of counsel in connection with their pre-trial plea negotiations with the Government. See United States v. Colotti, No. S3 04 Cr. 1110 (DLC), 2011 WL 6778475 (Dec. 21, 2011). That hearing was conducted over the course of four days in March 2012. This Opinion sets out the Court's findings of fact and the conclusions of law that it draws therefrom.

At the conclusion of the March hearing, the Court denied the remaining claims of petitioners Colotti and Dedaj on the

2

record.  For reasons that are discussed below, petitioner
Ivezaj's claims are hereby denied as well.

BACKGROUND

What follows is an account of the relevant facts as found
by the Court.  The findings are based on the trial record, the
submissions of the habeas petitioners, various documents
produced in support of the petitions, and the testimony of
witnesses during a four-day evidentiary hearing conducted in
March of 2012.

I.  The Indictment and Arrest

On October 6, 2004, petitioners, along with more than a
score of co-defendants, were charged in a multi-count indictment
arising from the Government's investigation of an Albanian
organized crime family (the "Rudaj Organization") in New York
City.  The Rudaj Organization was founded in the early 1990s
when Alex Rudaj and petitioner Nardino Colotti split from the
Genovese Organized Crime Family to form a rival organization.
Initially the Rudaj Organization concentrated its activities in
the Bronx and Westchester County, where it operated various
illegal gambling businesses.  In the summer of 2001, however,
the Rudaj Organization expanded into the Astoria section of
Queens, ousting the Lucchese Crime Family and seizing control of

3

a network of gambling parlors and video gambling machines stationed in bars and social clubs across Astoria.

The defendants charged in the indictment included the leaders of the Rudaj Organization, members of the Rudaj Organization who provided enforcement and other services, and individuals who ran individual gambling clubs that sent a significant stream of cash to the Rudaj Organization's leaders. Petitioners Colotti and Dedaj were the two most important people in the Rudaj Organization after Alex Rudaj himself. Colotti served as the Organization's liaison with Italian organized crime; Dedaj was in charge of loansharking and debt collection and helped collect gambling proceeds weekly from establishments that had agreed to accept the Rudaj Organization's illegal gambling machines. Petitioner Ivezaj supervised gambling clubs, provided protection services for bars and restaurants where the Rudaj Organization's gambling machines were installed, and, with the other leaders of the Rudaj Organization, helped to intimidate rivals and coerce victims.

As presented to the jury at trial, the indictment charged each of the three petitioners with substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; substantive and conspiracy gambling, in violation of 18 U.S.C. §§ 1955 and 371; the assault

4

of Mikhail Hirakis in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3); conspiracy to extort the owner of Cosmo's Bar, in violation of 18 U.S.C. §1951; and brandishing a firearm in furtherance of the substantive RICO crime, in violation of 18 U.S.C. § 924(c).  As relevant here, the indictment also charged: Dedaj and Colotti with the assault of Salvator Misale in aid of racketeering; Colotti with conspiracy to extort and attempted extortion of the Mirage strip club; Ivezaj with conspiracy to extort and attempted extortion of Calda's Bar; and Dedaj with conspiracy to use extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894.

The indictment charged fourteen predicate acts in support of the RICO allegations.  These included a number of the acts charged as substantive crimes in the indictment, as well as the extortion of Fotios Dimopoulos ("Dimopoulos"), who controlled gambling in Queens for the Lucchese crime family before the Rudaj Organization drove it out, and his associate Antonios Balampanis ("Balampanis"); an extortion at a gambling club known as Soccer Fever, an event that was critical to the Rudaj Organization's defense of its Queens gambling territory from an incursion effort by the Gambino crime family; and, most significantly, a conspiracy and attempt by Colotti and Rudaj to murder a criminal associate, Gaetano Peduto.

5

The three petitioners and a majority of the other defendants named in the indictment were arrested on October 26, 2004 and made their initial appearances before a magistrate judge the same day.  While many of the defendants were permitted to post bail, the three petitioners, Rudaj, and several others were designated for pre-trial detention.  The bail proceedings with regard to petitioner Ivezaj are particularly relevant here. On November 8, 2004, the Court conducted an initial hearing on the subject of Ivezaj's continued detention.  At that proceeding, counsel indicated that the defendant was prepared to offer a bail package valued at $750,000 and to submit to home monitoring.  The Court continued the detention, finding that in light of the "very serious charges [against him] with the potential for a substantial term of imprisonment," the proposed bail conditions were insufficient to deter the defendant from attempting to flee or to affect the testimony of potential witnesses.

II.  The Defendants Prepare for Trial.

Soon after the initial arrests, on November 3, 2004, the Court convened a conference at which trial was scheduled for September 26, 2005 and the Government was directed to produce discovery materials by December 17, 2004.  In the months that followed, many of the defendants pled guilty to some or all of

the allegations against them.  Ultimately, only seven defendants elected to proceed to trial: the three petitioners, Alex Rudaj, Ljusa Nuculovic, Gelosh Lelcaj, and Angelo DiPietro.

In preparation for trial, the three petitioners, Rudaj, their respective lawyers, and various others involved in preparing their defense met weekly to review the evidence produced by the Government during discovery and to coordinate their trial strategies.  The evidence to be offered at trial included intercepted Title III recordings of telephone conversations; consensual tape recordings made by two trial witnesses, Hirakis and Nicos Kyprianou ("Kyprianou"); surveillance photographs; and seized gambling machines, gambling paraphernalia, and documents.  Petitioners Dedaj and Colotti took particularly active roles in the joint defense meetings. They provided insight into the weaknesses of victims and potential witnesses that could be exploited on cross-examination, speculated as to which witnesses might not appear for trial, and suggested avenues to be pursued by the defendants' private investigator.  Dedaj also spent many hours reviewing the tape recordings with care, taking notes and reporting back to the group regarding their contents.

Dedaj was right to focus on the recordings, which contained particularly damaging evidence against the defendants.  Aside

7

from the attempted murder of Peduto, the most serious allegation in the indictment was the extortion of Soccer Fever, which was charged as a racketeering predicate and as a substantive violation of 18 U.S.C. § 924(c). The most profitable gambling game in Astoria was the barbout dice game, and the Rudaj Organization made sure that it had a monopoly on it. Within months after the Rudaj Organization had ousted the Lucchese family from Queens, the Gambino crime family, represented by Tommy Napoli, tried to open a rival barbout game at Soccer Fever. In August 2001, on the game's second night of operation, Rudaj and his associates forcibly entered Soccer Fever and, with guns drawn, took control of the Gambino associates and gamblers. They proceeded to toss over the gaming tables and attack one of the Greek gambler-owners of the game, Hirakis. Ivezaj seized Hirakis and Dedaj beat him.

On a tape recording from April 6, 2004, Rudaj described the Soccer Fever incident to Kyprianou. He explained that after Nuculovic had helped to get Rudaj and his men into the club, he had looked for Tommy Napoli but didn't find him. Rudaj then told his men to break the barbout table, and warned the gamblers: "I don't want to see nobody here. If I see one more time, I swear to God, I say, I beat you fucking one by one. I eat you up. It's closed." Rudaj attributed the attack on

Hirakis to the fact that Hirakis had disregarded the Rudaj Organization's warning not to go to Soccer Fever.  About a week later, in a conversation that began on April 15, 2004, Rudaj described again how he had closed Napoli's barbout game and made sure that Napoli didn't put any gambling machines into Astoria. As repeated to Kyprianou, he told Napoli when he met with him, "not in Astoria, you know.  This place . . . [is] my place, I say, I control it."

In gripping terms, on April 6, 2004, Ivezaj described on tape what would have happened if any of Napoli's henchmen, who were guarding the barbout game at Soccer Fever, had pulled a gun that night.  "If anybody do anything with guns, they're dead. If anybody takes a gun out, like you, you have a gun you take out, you get me, or I get you.  That's it."  In another conversation on that same day Ivezaj described dragging Hirakis by his hair and said they hit Hirakis so hard with a chair that it broke.

Nuculovic added to the recorded descriptions of that night. On February 12, 2004, Nuculovic characterized the Soccer Fever incident as an incident directed against Tommy Napoli and not the Greek people, even though Hirakis got hurt.  He admitted to Kyprianou that he had had a gun that night.

The recordings also included powerful evidence implicating the defendants in the beating of Tony Balampanis, charged as Racketeering Act Four in the indictment.  In a recorded conversation that began on April 15, 2004, Rudaj described to Kyprianou how he had taken over Astoria.  He said that Balampanis was an Albanian who spoke Greek and who "caught a beating" because of his connection to the Lucchese crime family, which controlled gambling in Queens before the Rudaj Organization drove it out.  After Balampanis broke some machines, Rudaj had Nuculovic "pull" Balampanis from next door and bring him to the place where Rudaj and his associates were waiting behind a door.  Rudaj and the others beat Balampanis so badly that there was blood "all over."

Having reviewed these materials, the defendants were well aware of the strength of the case against them.  Dedaj, for one, testified at the hearing held in connection with these petitions that soon after his arrest he conferred with fellow inmates at the Metropolitan Detention Center ("MDC"), who informed him that a RICO charge was likely to carry at least 20 years, followed by an additional seven years if he were convicted on the firearm charge.  When Dedaj later appeared before the Court to request that it accept a bail package totaling $5 million and the

10

request was denied, he became all the more conscious that he "had serious problems."

The strength of the Government's evidence notwithstanding, Ivezaj's lawyer, Mr. Ronald Rubenstein, expressed optimism about the chances of an acquittal at trial, at least on the § 924(c) charge.  On March 24, 2005, more than three months after the discovery materials were turned over, Ivezaj renewed his application for bail, proposing a bail package of close to $1 million.  The next day, a bail hearing was held, during which the Court inquired of the Government about the defendant's sentencing exposure if convicted at trial.  The Government responded:

> Your Honor, Mr. Ivezaj, we believe that Mr. Ivezaj's sentence would be in the teens. Mr. Ivezaj is charged in a 924(c) count, which raises a mandatory term of imprisonment to run consecutive to the other charges.  He is also charged in two racketeering counts, a violent act in aid of racketeering, gambling counts and, as Mr. Rubinstein pointed out, the Government has indicated that we intend to potentially charge Mr. Ivezaj with other acts of violence. . . . We believe that Mr. Ivezaj's sentence would probably be in the teens, maybe 13 or 14 years as a result of the offenses that he's currently been charged with."

Counsel for Ivezaj replied that he expected the sentence to be in the range of 24-35 months, due in part to his view that the evidence in support of the gun charge was "problematic to

11

the Government." Focusing on the importance of witness testimony to proof of the § 924(c) count, Mr. Rubenstein represented that the Government had failed to identify "any witness that they have: their wired witnesses, their cooperating witnesses who are unwired, their surveillance people, not one person [who] put a gun in Mr. Ivezaj's hand when any of these 'acts of violence' or any other time that he's alleged to be involved with."

While acknowledging that the security offered by the defendant was "very substantial," the Court denied the application for bail. It noted that the Government's evidence against the defendant was "extraordinarily strong" and that the defendant was aware of both the strength of the case and the fact that he faced substantial penalties if convicted at trial, particularly given the inclusion of the firearm charge. In light of these observations, the Court concluded that "the motive [on the part of the defendant] to confront the Government's evidence and to do something to weaken the case [was] substantial" and that pre-trial detention was necessary to "ensure the security of the prosecution and the community."

III. Pre-trial plea discussions

As noted above, the majority of the defendants charged in the original indictment pled guilty. The Government was

12

reluctant, however, to allow the key figures in the Organization to plead guilty to reduced charges if there was to be a trial involving any of the defendants charged with the racketeering conduct.  AUSA Timothy Treanor, who led the prosecution for the Government, wanted Rudaj and Colotti in particular "at the table" if there was to be no global plea that would resolve the case entirely.  Consistent with this position, AUSA Treanor made it clear to Colotti's lawyer, Joseph Tacopina, on numerous occasions that no plea offer was likely to be extended to his client.  The Government never extended a plea offer to Rudaj.

The Government was more open to persuasion where Dedaj, Ivezaj, and Lelcaj were concerned.  On August 9, 2005, slightly more than a month before trial, AUSAs Treanor and Jennifer Rodgers met with Roy Kulcsar, who represented petitioner Dedaj; Mr. Rubenstein, who represented petitioner Ivezaj; and Flora Edwards, who represented Gjelosh Lelcaj, at the United States Attorney's Office in Manhattan.  The meeting seems to have been arranged at Dedaj's urging.  As noted above, Dedaj was well aware that a conviction at trial could result in a sentence of 27 years or more.  For this reason, he had made it known to Mr. Kulcsar that he wanted to "plead the case out," provided that he could negotiate a disposition that would allow him to be released from prison within seven years -- in time to witness

the college graduation of his then-14-year-old son.  Dedaj
resolved to arrange a meeting between the Government and Mr.
Kulcsar at which attorneys for two other co-defendants would be
present.  He approached Ivezaj and his relative Gjelosh Lelcaj.
Both men agreed to send their lawyers to the meeting.

During the August 9 meeting, the Government presented
counsel with its estimate of the defendants' sentencing exposure
if they were convicted at trial.  The discussion centered
primarily on the extortion and firearm charges stemming from the
raid on Soccer Fever, the most serious charges facing the three
defendants whose lawyers attended the meeting.  Among other
things, the Government indicated that the Sentencing Guidelines
Offense Level ("OL") for the Soccer Fever incident alone was 34,
before any adjustment for a defendant's leadership role.[1]  Since

---

[1] The Guidelines calculations that the Government prepared to
guide its plea discussions treated the defendants' uses of
firearms as sentencing enhancements rather than as mandatory
consecutive terms under 18 U.S.C. § 924(c).  For example,
because the Government contended that every member of the
Organization who was involved in the Soccer Fever extortion had
carried a gun, the calculation of an OL of 34 included a six-
level adjustment for the use of a firearm.  This approach had
the benefit of holding the defendants responsible for their use
of firearms, while offering them the opportunity to avoid a
conviction under § 924(c) and with it the risk that a future
firearms offense would result in a mandatory 25-year consecutive
sentence.  See 18 U.S.C. § 924(c)(1)(C)(i) (specifying a
mandatory consecutive term of 25 years for a "second or
subsequent conviction" under the statute).  Had the Government

14

both Ivezaj and Dedaj were in Criminal History Category ("CHC")
I, this translated to a Guidelines range of 151-188 months (or
about 12.5-15.5 years).  The prosecutors added that they
assigned three- and four-level leadership role adjustments to
Ivezaj and Dedaj, respectively.[2]

The Government also informed counsel that a Second
Superseding Indictment was being prepared.  Most significantly
for these purposes, the superseding indictment, which was filed
six days later, on August 15, added, as substantive crimes and
racketeering predicates, charges related to: the extortion of
Cosmo's Bar by Rudaj, the three petitioners, and others; the
extortion of the Mirage strip club by Rudaj, Colotti and
DiPietro; and the extortion of Calda's Bar by Ivezaj and
DiPietro.

No plea offers were made at the August 9 meeting.  The next
day, however, AUSA Rodgers telephoned Mr. Rubenstein and offered
Ivezaj the opportunity to plead to the two RICO predicate acts

---

treated the firearm charge as a separate offense, as USSG
§ 2K2.4 requires when a defendant charged under § 924(c) goes to
trial and is convicted, it would have estimated the offense
level for the Soccer Fever extortion at 28 before any role
adjustment.

[2] In CHC I, the Guidelines range applicable to an OL of 37 is
210-262 months (or 17.5-22 years); the range applicable to an OL
of 38 is 235-293 months (or about 19.5-24.5 years).

related to Soccer Fever and the Balampanis beating, without the three-level adjustment for Ivezaj's role. This would result in an OL of 33, which, given that Ivezaj was in CHC I, would have generated a Guidelines range of 135-168 months (11.25-14 years).

Mr. Rubenstein's contemporaneous notes reveal that during the call AUSA Rodgers described in detail the Government's estimate of Ivezaj's sentencing exposure at trial. AUSA Rodgers reminded Mr. Rubenstein that his client would face four extortion charges, the most serious of which related to Soccer Fever. The Government calculated OLs of 27 for the Calda's Bar extortion, 28 for Cosmo's Bar, 30 for the Balampanis beating, and, as noted above, 37 for Soccer Fever. AUSA Rodgers and Mr. Rubenstein also discussed the sentencing implications of the firearm charge and the fact that the Government was also extending offers to Lelcaj and Dedaj. Lelcaj would be permitted to plead guilty to charges that would result in an offense level of 26; Dedaj would be offered a plea that would result in an offense level of 35.[3] Thus, the plea offer for Ivezaj at OL 33

_____

[3] In fact, the offer to Dedaj required him to plead to charges resulting in an offense level of 36. The confusion may have stemmed from the fact that the Government's notes regarding outstanding plea offers incorrectly transcribed the sentencing range applicable to a defendant in CHC I whose OL was 36. While the lower bound was correct (188 months), the upper bound is 235 months, not 210 as indicated in the notes. Two hundred ten

16

fell in between the offers to the two co-defendants, reflecting the Government's view of their comparative importance within the Rudaj Organization.

After the call, Mr. Rubenstein analyzed the Government's Guidelines calculations and, in particular, its estimate of the offense level applicable to the Soccer Fever extortion. He calculated that, if convicted on all of the charges in the indictment except for the gun charge, and using the Government's estimate of the offense levels on the four extortion predicates, Ivezaj was likely to face an offense level of 35 once the offenses were grouped. This would have resulted in a sentencing range of 168-210 months (or 14-17.5 years). He also noted that, if Ivezaj were to plead guilty to the indictment, Ivezaj's offense level would be 32 (35 minus three points for acceptance of responsibility). Once the consecutive seven-year term for the firearm charge was added, Ivezaj would face a sentence of 205-235 months (or about 17-19.5 years) on such a plea. But, with regard to the Soccer Fever count, Mr. Rubenstein questioned whether the Government was correct to anticipate a two-point enhancement for physical restraint, a three-point enhancement for bodily injury, and whether its loss calculation was

---

months is, however, the upper bound applicable to a Category I defendant whose offense level is 35.

unrealistically high.  He also thought that no leadership
enhancement was warranted.

Within a few days, Mr. Rubenstein went to the MDC to meet
with his client.  They discussed the Government's offer of about
11-14 years and, to put it in perspective, the offers that were
being extended to Dedaj and Lelcaj.  Mr. Rubenstein also
presented the Government's calculation of the Sentencing
Guidelines that would apply if Ivezaj were to go to trial and be
convicted on all of the charges.  In substance, he told Ivezaj
that the Government calculated a Sentencing Guidelines range of
roughly 14-17.5 years, followed by another seven years for the
firearm.  He explained that Ivezaj would only receive a three-
level adjustment to his Sentencing Guidelines calculation for
acceptance of responsibility if he entered a plea of guilty.  He
opined, however, that the Government's Guidelines estimate with
regard to loss amount was aggressive and that several of the
enhancements it would apply for the Soccer Fever extortion were
arguably inapplicable.  He told Ivezaj that an acquittal on the
firearm count would -- in the worst-case scenario, based on the
Government's own calculations -- put Ivezaj in a sentencing
range that would result in his serving an additional prison term
of about thirteen years.  In light of these views, both Mr.
Rubenstein and Ivezaj were "unhappy" with the plea offer from

18

the Government of 11-14 years.  Although Ivezaj was eager to
avoid trial, he did not want to accept a plea that was "in the
double digits."  Ivezaj elected to reject the Government's offer
and directed Rubenstein to make further efforts to secure an
offer that would result in a sentence of five or, at most, six
years.

Consistent with the Government's representations to Mr.
Rubenstein, offers were extended to Dedaj and Lelcaj on August
10 as well.  AUSA Treanor reached Roy Kulcsar while the latter
was driving on the freeway.  AUSA Treanor informed Mr. Kulcsar
that he had called to make an offer to Dedaj and that it "was
somewhat complicated based on the Guidelines and how he
arriv[ed] at it."  Mr. Kulcsar stopped the car and took notes of
the information that AUSA Treanor conveyed.  The offer was for a
plea to a RICO count and the predicate acts related to Soccer
Fever and the Misale extortion.  This would result in an OL of
36, with no consecutive term for the firearm charge under
§ 924(c).  The Government estimated that if he accepted the
plea, Dedaj would be facing a sentencing range of 188-210 months
(or about 15.5-17.5 years).[4]  If he rejected it, the Government
estimated, Dedaj could be facing an OL of 38, before any

---

[4] As noted above, the Government seems to have reported the upper
bound of the Guidelines range incorrectly.  It would have been
235 months, not 210.

19

grouping analysis.  Since Dedaj was in CHC I, this would result in a sentencing range of 235-293 months (or about 19.5-24.5 years), plus an additional seven years for a conviction on the firearms offense.

Mr. Kulcsar went to see his client "within a day" and presented him with the Government's offer and its breakdown of the sentencing exposure that he faced.  During their conversation, Mr. Kulcsar referred to the notes that he had taken in the car during his conversation with the Government. Dedaj was "upset" with the offer, because he felt that it exaggerated his role in the Rudaj Organization.  He rejected the offer, insisting that it was not worth it to him to accept a plea that would result in his serving a sentence longer than seven more years, because it would mean that he could not be a part of his son's life.

Colotti's lawyer, Joseph Tacopina, quickly assessed that his client was facing an "enormous[ly]" high sentence and that the evidence on many of the counts was "overwhelming."  At the beginning of the representation, Mr. Tacopina sat down with Colotti and discussed his options, including the possibility of a plea, and their potential ramifications.  He advised Colotti that the best strategy would be to pursue a plea disposition. Colotti, however, was intent on going to trial, where he was

confident that he would be vindicated.  Mr. Tacopina persisted, however, raising the issue of a plea with Colotti on several occasions leading up to trial.  Mr. Tacopina walked his client through the tape recordings and explained how the evidence could be used against him at trial and how damning it would be. Colotti rejected these overtures outright, telling Mr. Tacopina on one occasion that he would rather "take it like a man" and serve a stiff prison term than plead guilty to the charges.

Nonetheless, Mr. Tacopina worked assiduously on behalf of his client to secure a favorable plea offer from the Government. As noted above, the Government was initially disinclined to permit Colotti to plead to lesser counts if any of the other defendants in the Organization were to go to trial.  But after approaching AUSA Treanor on several occasions, Mr. Tacopina succeeded in securing a "not too generous" plea offer from the Government.  On August 18, 2005, AUSA Treanor contacted Mr. Tacopina's office and spoke with an associate, Chad Seigel. AUSA Treanor explained the terms of the Government's offer, which required Colotti to plead to the Soccer Fever and Mirage extortions.  As AUSA Treanor explained to Mr. Seigel, the Government estimated that the offer would result in an OL of 36 once the three-point reduction for acceptance of responsibility was applied; Colotti would thus face a Guidelines range of 210-

262 months (or about 17.5-22 years).  The chief benefit of the
offer was that it did not require Colotti to plead guilty to the
attempted murder of Peduto, a charge that could have carried
extremely severe sentencing consequences.

Mr. Seigel relayed the offer to Mr. Tacopina and another
associate, George Vomvolakis, and together they analyzed its
terms.  Because Mr. Tacopina had hoped to secure an offer in the
10-12 year range, the men discussed whether there were points on
which the Government would be open to negotiation and whether
the Government's Guidelines calculation could be challenged at
sentencing in order to bring down the prospective prison term.

Soon after the offer was extended, Mr. Tacopina went to
meet with Colotti at the MDC.  He conveyed the Government's
offer, its Guidelines calculation, and his own view of Colotti's
exposure at trial.  The conversation was "a relatively brief
one," because the offer was "obviously something that [Colotti]
wasn't interested in."  In fact, Colotti laughed when he was
told of the offer and its terms.  Mr. Tacopina assured Colotti
that he would make further efforts to secure an offer on more
favorable terms.

In the weeks that followed, Mr. Tacopina had numerous
conversations with AUSAs Treanor, Rodgers and Benjamin
Gruenstein about the possibility of Mr. Colotti's pleading

guilty.  Ultimately, however, it became clear that the
Government would not accept a plea to anything less than the
August 18 offer.  Mr. Tacopina therefore concluded that it was
in Colotti's interest to accept the Government's offer.  Colotti
was adamant, however, that he wanted to go to trial.  In an
effort to convince him to reconsider, Mr. Tacopina sent Mr.
Vomvolakis, a former assistant district attorney, to the MDC to
meet with Colotti shortly before trial was set to begin.
Because the counsel rooms at the MDC were all occupied, the
meeting took place in the visiting room.  The two men sat close
together and spoke quietly to avoid being overheard.  Mr.
Vomvolakis reiterated the terms of the Government's August 18
offer and conveyed the fact that both he and Mr. Tacopina
believed that it was in Colotti's best interest for him to
accept the Government's offer.  Colotti reacted angrily to the
suggestion that he might plead guilty and began cursing.
Frightened for his safety, Mr. Vomvolakis immediately stopped
the discussion.  Shaken, he left the MDC quickly thereafter.

As the trial date loomed, it became increasingly obvious to
the defendants and their lawyers that any trial would last a
substantial period of time and come at considerable expense.
Yet, of the defendants who proceeded to trial, only Angelo
DiPietro made an application to the Court before trial for

assistance in paying his legal fees.  In a September 9, 2005 letter, DiPietro's retained counsel, Joseph Bondy, sought permission to be paid out of Criminal Justice Act (CJA) funds or, in the alternative, to be replaced by a member of the CJA panel for this District.  While refusing to permit Mr. Bondy's immediate withdrawal so close to trial, the Court authorized the appointment of a CJA panel member to serve as co-counsel, with the understanding that Mr. Bondy would be relieved once incoming counsel had mastered the case.  CJA counsel Martin Geduldig was appointed and, on November 2, 2005, having found that Mr. Geduldig no longer needed Mr. Bondy's assistance, the Court relieved Mr. Bondy.

Dedaj and his lawyer, Mr. Kulcsar, were well aware in advance of trial that the funds available for Dedaj's defense were extremely limited.  In recognition of Mr. Dedaj's financial straits, the Court authorized the use of CJA funds to provide paralegal and other litigation support to Mr. Kulcsar during trial.  Yet there was no indication that Mr. Dedaj was having difficulty paying his attorney's fees until November 23, 2005 -- almost a month after trial began -- when Mr. Kulcsar wrote to the Court requesting a temporary appointment to the CJA Panel so that his fees could be paid from public funds.  The Court denied the request, noting that Dedaj's need for public assistance in

paying his attorney's fees could have been anticipated before trial when, like DiPietro, he could have been assigned representation by a regular member of the CJA Panel.  The Court also noted that public policy considerations weigh against appointing retained counsel to the CJA Panel on an ad hoc basis and that, in any event, Dedaj's extended family had access to substantial assets, as evidenced by the multi-million dollar bail package that was offered on his behalf.

IV.  Trial and Sentencing

Trial began as scheduled on September 26, 2005.  Given the anticipated length of the case, over a day was devoted to selecting a jury from a pool of over 500 potential jurors.  On the second day of trial, shortly after the jury had been seated, one of the defendants, Gjelosh Lelcaj, pled guilty pursuant to an agreement with the Government that required him to admit to the gambling offenses, the extortion of Cosmo's Bar and a charge of illegal re-entry following deportation.  As a result, only six defendants proceeded to trial.

The Government delivered its opening statements on the afternoon of September 27, and the defendants delivered theirs the next day.  For strategic reasons, the defendants had agreed during their pre-trial meetings to concede guilt with respect to the gambling offenses in the hope of reducing the likelihood

25

that they would be convicted on the more serious charges.  The
opening statements by defense counsel reflected this strategy.
In a joking reference to the concession, AUSA Gruenstein, who
delivered the opening statement for the Government, remarked to
Rudaj's lawyer during a break, "If we knew you were going to
concede gambling, things would have been different."  Dedaj, who
overheard this comment, said something to the effect of, "It's
not too late to give us an offer."

The trial lasted for fifteen weeks, concluding on January
4, 2006, when the jury returned its verdict convicting the three
petitioners on all counts except for the assault of Hirakis in
aid of racketeering.  The jury also found that, with regard to
the three petitioners, the Government had proven all of the
charged racketeering predicates except for the attempted murder
of Peduto.  Notwithstanding Mr. Rubenstein's assertion during
summation that there was "no evidence at all of guns used in the
aid of racketeering," the jury convicted Ivezaj on the firearm
charge.

Within weeks of the verdict, Ivezaj's brother -- David
Ivezaj -- began interviewing attorneys with the view of
replacing Mr. Rubenstein for sentencing and on appeal.  On
January 20, 2006, David Ivezaj met with attorney Joshua Dratel
regarding the possibility of Mr. Dratel's taking on the

representation.  During their meeting, David Ivezaj reported to
Mr. Dratel that Mr. Rubenstein had miscalculated Prenka's
sentencing exposure if convicted at trial.  According to David,
the Government had offered Prenka a plea that would have
resulted in his spending eight years in prison.  Prenka rejected
the offer because Mr. Rubenstein advised him that his potential
exposure at trial was 12-14 years in prison; Prenka realized
only later that his true exposure was in excess of twenty years.
Mr. Dratel also met with Prenka Ivezaj personally -- first on
February 7 and again on February 14.  In these meetings, Ivezaj
gave substantially the same account of his plea discussions with
Mr. Rubenstein, adding only that Mr. Rubenstein had confessed
his error and promised to supply an affidavit describing the
miscalculation.

The Probation Department circulated draft Presentence
Investigation Reports for Ivezaj, Dedaj and Colotti on March 17,
2006.  The draft report for Ivezaj calculated his offense level
at 35, yielding a Guidelines range of 168-210 months (or 14-17.5
years), before the application of the mandatory seven-year
consecutive term.[5]  One week later, Prenka Ivezaj met with

_____

[5] On the Government's objection, the PSR was later amended to
include a three-point enhancement for a "demonstrated ability to
carry out a threat of . . . serious bodily injury."  See USSG
§ 2B3.2(b)(3)(B).  This resulted in a final recommendation of

attorney Richard Greenberg, whom he ultimately retained to represent him during sentencing and on appeal.  At Mr. Greenberg's request, Mr. Rubenstein also attended the first part of the meeting.  Before the meeting, Mr. Rubenstein's office faxed to Mr. Greenberg Mr. Rubenstein's handwritten notes reflecting the Government's plea offer and prediction of Ivezaj's sentencing exposure after trial, as well as his own pre-trial sentencing calculations.

At the joint meeting with Ivezaj, Mr. Rubenstein outlined for Mr. Greenberg in broad strokes the history of his plea discussions with the Government and the fact that an offer had been extended to Ivezaj following the August 9, 2005 meeting. Mr. Rubenstein revealed that Ivezaj had become "upset" when he learned what had transpired at the meeting.  "He wanted to stay strong and adamant, hoping for a lower plea offer."

Mr. Rubenstein explained that he too had felt that the Government's offer of 11.25-14 years was unreasonable.  Although the Government had given him numbers regarding Ivezaj's potential sentencing exposure, and he had relayed these to his client, Mr. Rubenstein believed that there were "several arguments that . . . were available on Sentencing Guidelines

_____

OL 38 for Ivezaj.  As noted below, however, the Court ultimately found that the correct offense level was 35.

28

calculations that should be decided favorably to Mr. Ivezaj,"
including arguments about Ivezaj's role, the loss amount, and
the absence of any serious bodily injury to Hirakis.  In light
of these views, Mr. Rubenstein had told his client that, in the
worst case, his Guidelines range would add thirteen years to his
prison term and could well result in less if the range could be
reduced to "the low teens."

Mr. Rubenstein relayed this conversation to Mr. Greenberg
and insisted that, notwithstanding the unfavorable jury verdict,
many of the sentencing arguments that he had anticipated making
remained valid.  He told Mr. Greenberg that, if he proved to be
wrong, as "a stand-up guy from Brooklyn," he would "fall on his
sword" and provide an affidavit setting out the advice he had
given his client.

The petitioners were sentenced on June 16, 2006.  Mr.
Greenberg's submission on behalf of Ivezaj adopted each of the
relevant arguments about the Sentencing Guidelines that Mr.
Rubenstein had identified.  In imposing sentence, however, the
Court rejected Mr. Greenberg's contention that the Guidelines
range applicable to Ivezaj "should be about 11 years or less,"
including the 7-year consecutive sentence for the firearm.  The
Court found instead that Ivezaj's conviction placed him at
OL 35, which produced a sentencing range of 168-210 months (or

14-17.5 years) before the seven-year consecutive term was applied.  Ivezaj was sentenced principally to 180 months' imprisonment; Dedaj was sentenced principally to 235 months' imprisonment; Colotti was sentenced principally to a term of imprisonment of 240 months.  Each of the petitioners was also sentenced to a consecutive term of imprisonment of seven years to reflect his conviction on the firearm count.

One of the petitioners' co-defendants, Ljusa Nuculovic, was also scheduled to be sentenced on June 16.  During his sentencing hearing, however, Nuculovic complained about the representation that retained counsel Robert Koppelman had provided to him at trial.  The Court promptly appointed new counsel to represent Nuculovic and deferred his sentence so that the ineffective assistance claim could be litigated.  On September 15, 2006, Nuculovic's appointed counsel filed a motion pursuant to Rule 33, Fed. R. Crim. P., seeking a new trial on the basis of Mr. Koppelman's purportedly ineffective representation.  That motion was denied in an Opinion of December 12, 2006, United States v. Nuculovic, No. S3 04 Cr. 1110 (DLC), 2006 WL 3591930 (S.D.N.Y. Dec. 12, 2006); only then was Nuculovic sentenced.

The convictions were affirmed on appeal.  United States v. Ivezaj, 568 F.3d 88 (2d Cir. 2009); United States v. Ivezaj,

30

Nos. 06-3112-cr(L), 06-3275-cr(CON), 06-3296-cr(CON), 06-3339-cr(CON), 06-3372-cr(CON), 06-5908-cr(CON), 2009 WL 1636018 (2d Cir. June 11, 2009).

V.  The Petitions for Habeas Corpus

On February 28, 2011, petitioners Ivezaj and Colotti each filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255.  Petitioner Dedaj, represented by retained counsel, filed a similar petition on March 4, 2011.  In an Opinion of December 21, 2011 the petitions were denied in part, along with those of three co-defendants -- Rudaj, DiPietro, and Nuculovic.  See United States v. Colotti, No. S3 04 Cr. 1110 (DLC), 2011 WL 6778475 (Dec. 21, 2011).

The Court reserved decision on petitioners' claims that they were improperly advised by their attorneys in their plea negotiations with the Government.  A hearing was scheduled to develop the factual record with respect to these claims, and counsel was appointed to assist Colotti and Ivezaj in identifying evidence and presenting their arguments at the hearing.  The Court heard testimony and argument regarding petitioners' claims of ineffective assistance over the course of four days in March 2012.  At the conclusion of the hearing, the petitions of Colotti and Dedaj were denied on the record, with the assurance that an Opinion would follow setting forth more

31

fully the reasons for the Court's decision.  This is that
Opinion.  With respect to Ivezaj's petition, however, the Court
declined to rule at the hearing.  Instead, the parties were
invited to submit letter-briefs addressing the issue of when a
lawyer's incorrect prediction of his client's sentencing
exposure constitutes ineffective assistance of counsel.  Having
reviewed these submissions in light of the evidence presented at
the March 2012 hearing, the Court now denies Ivezaj's petition
as well for the reasons set forth below.

DISCUSSION

Claims of ineffective assistance of counsel are evaluated
according to the framework set out in <u>Strickland v. Washington</u>,
466 U.S. 668, 687 (1984); <u>accord</u> <u>Bennett v. United States</u>,
663 F.3d 71, 84 (2d Cir. 2011).  "First, the defendant must show
that counsel's performance was deficient.  This requires showing
that counsel made errors so serious that counsel was not
functioning as the 'counsel' guaranteed by the Sixth Amendment."
<u>Strickland</u>, 466 U.S. at 687.  "Second, the defendant must show
that the deficient performance prejudiced the defense."  <u>Id.</u>

The Supreme Court has recently made clear that plea
negotiations constitute a "critical stage" of the criminal
proceedings to which the Sixth Amendment right to counsel, and
therefore <u>Strickland</u>'s framework for ineffective assistance

claims, attaches.  Missouri v. Frye, 566 U.S. ---, 2012 WL

932020, at *7 (Mar. 21, 2012); accord United States v. Purdy,

208 F.3d 41, 44 (2d Cir. 2000).  In order to provide

constitutionally adequate representation in the context of plea

negotiations, a lawyer must generally advise the client of any

offer that the Government extends, Frye, 2012 WL 932020, at *8 ;

Pham v. United States, 317 F.3d 178, 183 (2d Cir. 2003); outline

"the strengths and weaknesses of the case against him," Purdy,

208 F.3d at 45; and provide an estimate of the defendant's

sentencing exposure at trial.  Id.  A defendant seeking to

vacate his conviction on the ground that his lawyer failed to

comply with these requirements must demonstrate that "but for

the ineffective advice of counsel there is a reasonable

probability that . . . [he] would have accepted the plea and the

prosecution would not have withdrawn it in light of intervening

circumstances." Lafler v. Cooper, 566 U.S. ---, 2012 WL 932019,

at *5 (Mar. 21, 2012); Raysor v. United States, 647 F.3d 491,

495 (2d Cir. 2011).  The defendant must further show "that the

court would have accepted [the plea's] terms, and that the

conviction or sentence, or both, under the offer's terms would

have been less severe than under the judgment and sentence that

in fact were imposed." Lafler, 2012 WL 932019, at *5.

I.  Ivezaj

Ivezaj's initial petition for habeas corpus, filed without
the assistance of counsel, devoted six pages to the argument
that "defendant Ivezaj did not receive the constitutionally
mandated professional advice regarding his plea offer."  Most
significantly, the petition and supporting affidavits alleged
that, when asked by Ivezaj "what kind of sentence [he] could
expect if . . . convicted after trial," Mr. Rubenstein replied
that the "worst case scenario for a sentence was 13 years."  The
petition did not provide sufficient context to determine whether
Mr. Rubenstein's reference to the "worst case scenario" was
intended to be a description of the maximum sentence applicable
to the offenses with which Mr. Ivezaj had been charged, or
whether, instead, Mr. Rubenstein was making a prediction about
the sentencing consequences of those charges on which Ivezaj was
likely to be convicted at trial.  One indicator that the
petition may have intended the latter interpretation is that it
presented Rubenstein's "worst case scenario" comment in the
context of a lengthy discussion of his failure adequately to
alert Ivezaj to the overwhelming likelihood that he would be
convicted at trial.

Whatever was intended in the initial filing, however, the
theory that Ivezaj pursued at the evidentiary hearing was that

34

Mr. Rubenstein inaccurately advised him as to the maximum amount
of time that he could be required to serve if he were convicted
of all of the offenses charged in the indictment.  He emphasizes
that the thirteen-year maximum predicted by Mr. Rubenstein
differs markedly from the 377 months or roughly 32 years
calculated in the final PSR.[6]  This error, Ivezaj argues,
prevented Mr. Rubenstein from properly advising him about the
potential benefits of the Government's plea offer.  Ivezaj
maintains that, had he known that it was possible that he would
receive a sentence in excess of 20 years, he would have accepted
the Government's plea offer.  This argument fails for several
reasons.

First, Ivezaj has not shown that Mr. Rubenstein's
representation was in fact ineffective under Strickland's first
prong.  As noted above, a lawyer advising his client about the
wisdom of accepting a plea offer must generally inform him of
the sentence to which he would be exposed if convicted at trial.
As the Second Circuit has recognized, "knowledge of the
comparative sentence exposure between standing trial and
accepting a plea offer will often be crucial to the decision
whether to plead guilty."  United States v. Gordon, 156 F.3d

---

[6] The PSR arrived at an OL of 38, to be followed by a seven-year
consecutive sentence on the firearm charge, for a sentencing
range of 319-377 months.

376, 380 (2d Cir. 1998) (citation omitted).  Because
voluntariness is the sine qua non of a valid guilty plea,
however, "a lawyer must take care not to coerce a client into
either accepting or rejecting a plea offer."  Purdy, 208 F.3d at
45.  In deference to this consideration, the law affords counsel
broad discretion in choosing "how best to advise a client in
order to avoid, on the one hand, failing to give advice and, on
the other, coercing a plea."  Id.

  That balance is particularly delicate where the issue is a
defendant's sentencing exposure.  As the Supreme Court
recognized in Frye, because ours "is for the most part a system
of pleas, not a system of trials . . . 'longer sentences exist
on the books largely for bargaining purposes.'"  2012 WL 932020,
at *6 (quoting Rachel Barkow, Separation of Powers and the
Criminal Law, 58 Stan. L. Rev. 989, 1034 (2006)).  In theory, a
defendant runs the risk that the sentencing court will impose
consecutive prison terms at the statutory maximum on all of the
counts of conviction.  Tellingly, however, Ivezaj does not argue
that it would have been helpful for Mr. Rubenstein to list the
statutory maximum sentences for each of the counts in which he
was charged in the indictment.  That is because, in practice,
"the statutory maximum is rarely the sentence imposed," Ewing v.
California, 538 U.S. 11, 43 (2003) (Breyer, J., dissenting), and

it is the custom in the federal system to run sentences concurrently unless a statute dictates otherwise.

A lawyer should, of course, advise his client of his exposure at trial, but in order to avoid the risk that the specter of an extreme sentence may unduly pressure the defendant to accept a plea, the lawyer must provide a realistic assessment of the sentence the defendant might expect if convicted at trial.  This is an extremely challenging task.  In doing so, he must predict the strength of the Government's evidence on each count and the likelihood of conviction, as well as present his own view of the applicable Sentencing Guidelines range following adjustments and the possibility that the sentencing court might apply a non-Guidelines sentence upon considering the factors set out in 18 U.S.C. § 3553(a).  Because this assessment requires the attorney to give his client advice on matters that are contingent and, to some degree, subject to chance, an inaccurate prediction as to the sentence a defendant is likely to receive after trial should only rarely be susceptible to an ineffective assistance claim.  See United States v. Sweeney, 878 F.2d 68, 70 (2d Cir. 1989).  Defendants would be ill served by counsel who operate under incentives to estimate only the harshest sentencing outcomes.  Generally, therefore, only when counsel's advice turns on a mistaken conclusion regarding a matter that is

"ultimately knowable" should an ineffective assistance claim

lie.  <u>See</u> <u>United States ex rel. Hill v. Ternullo</u>, 510 F.2d 844,

847 (2d Cir. 1975).[7]

---

[7] <u>United States v. Gordon</u>, 156 F.3d 376, is not to the contrary.
In that case, the Second Circuit affirmed the District Court's
vacatur of a conviction on ineffective assistance grounds after
defense counsel confessed that, in the context of plea
discussions, he had written a letter to his client incorrectly
advising him that he faced a maximum sentencing exposure at
trial of 120 months.  In fact, after the defendant proceeded to
trial and was convicted, the Probation Department calculated the
applicable Guidelines range at 262-327 months.  The error seems
to have resulted from counsel's erroneous conclusion that the
Guidelines, then binding on district courts, required that the
offenses of conviction be grouped together for sentencing
purposes.  <u>See</u> Brief for the United States, <u>United States v.
Gordon</u>, 156 F.3d 376 (2d Cir. 1998), (No. 97-2397), 1997 WL
33621994, at *5.

Contrary to Ivezaj's assertion, <u>Gordon</u> does not stand for
the proposition that a lawyer's inaccurate prediction regarding
the sentence his client is likely to receive after conviction
may constitute ineffective assistance of counsel.  Although the
Government had argued that counsel's reference to 120 months
should be construed as such a prediction in light of the fact
that the letter also referenced the "possibility that Gordon
could be sentenced to ten years for each count under the
indictment consecutively," 156 F.3d at 380, the Court refused to
adopt this reading.  Rather, as the Court noted, the District
Court had found that counsel's conclusion was "clear that Gordon
faced a maximum incarceration of 120 months."  <u>Id.</u>  As that
finding was not clearly erroneous and supported a conclusion
that counsel had misadvised his client as to a matter that was
"ultimately knowable" -- namely his maximum sentencing exposure
-- the Court of Appeals did not disturb the ruling of the
District Court.

Contrary to Ivezaj's claim, the record does not support a finding that Mr. Rubenstein advised him that it was legally impossible for Ivezaj to receive a sentence in excess of thirteen years.  Mr. Rubenstein accurately reported the plea offer's terms to Ivezaj, as well as the Government's own prediction of Ivezaj's sentencing exposure.  As already noted, the Government calculated the combined adjusted OL for the acts with which Ivezaj would be charged in the superseding indictment at 35.  This would have resulted in a sentencing range of 168-210 months (or 14-17.5 years), to be followed by a mandatory consecutive 84 months (7 years) for brandishing a firearm.  It is not credible that, having just conveyed this information, Mr. Rubenstein then maintained that, notwithstanding the Government's calculation that Ivezaj faced up to 25 years in prison, he was nevertheless guaranteed to serve no more than thirteen years if convicted.

Ivezaj's account is even more implausible in light of the fact that throughout the pretrial process both he and Mr. Rubenstein had been made well aware that the offenses charged in the indictment carried a potential term of imprisonment well in excess of 20 years.  As discussed above, from the moment Ivezaj first appeared before the Court it was emphasized to him that he faced severe penalties if convicted at trial.  Ivezaj was also

in frequent contact with his co-defendants, including Dedaj, who shared with him his desire to plead guilty in light of the fact that, after conviction, the RICO charges were likely to carry a sentence of 20 years, to be followed by a mandatory, consecutive term of seven years on the firearm count.

There is yet another reason to find that Ivezaj was well aware that he faced a potential sentence of much more than thirteen years. Ivezaj knew that Dedaj's sentencing exposure at trial was in excess of 27 years and that the Government had offered Dedaj the opportunity to plead to counts that would carry a sentence of about 17 years. He cannot have believed that the Government would offer Dedaj such a substantial discount for pleading guilty while offering Ivezaj, a more junior member of the Organization, a discount of only a year or two. Mr. Rubenstein was aware that Ivezaj had access to this information regarding his own sentencing exposure and that of his co-defendants; it is simply implausible that he told Ivezaj that he faced at most a sentence of thirteen years when the Government, the other defendants in the case, their lawyers, and the Court had made it abundantly clear to both lawyer and client that the time at stake was significantly greater.

The context in which Mr. Rubenstein predicted a worst-case scenario of an additional thirteen years is not hard to fathom.

This prediction accepted the Government's Guidelines calculations except for its assumption that the defendants would be convicted on the firearm charge. When Mr. Rubenstein met with Ivezaj to discuss the Government's offer of 11-14 years, he did not present any competing calculation that Ivezaj faced a Sentencing Guidelines range of at most six years, to which a conviction under § 924(c) would add seven years. Instead, their discussion of Ivezaj's likely exposure following trial was premised on the defendants' expectation that the Government would not prevail on the firearm count. The defendants believed that they were in a far better position than their attorneys to evaluate which witnesses would testify against them. Apparently, they did not expect Hirakis, a Greek gambler and the only anticipated eyewitness to the Soccer Fever incident, to appear at trial. Without such eyewitness testimony, the only evidence to support the § 924(c) count would be the tape recordings, which the defendants believed were insufficient to convince a jury to return a conviction. Mr. Rubenstein indicated, in effect, that if the defendants were correct in their prediction that they would be acquitted on the firearm count, Ivezaj could expect to find himself in a sentencing range for which the upper bound would require him to spend at most an additional thirteen years in prison. Mr. Rubenstein added that

41

he believed he had strong arguments to reduce that Guidelines range to the low teens.

Given the defendants' optimism about their chances at trial and Ivezaj's unwillingness to accept a plea "in the double digits," Ivezaj rejected the Government's offer, fully aware of the potential consequences of that decision.  In an effort to avoid those consequences now that they have come to pass, he asserts that Mr. Rubenstein's advice was something other than what it was -- a pronouncement regarding Ivezaj's exposure under the law, rather than a prediction about what might happen at trial.  But the evidence does not comport with Ivezaj's claim, and the only corroboration he can provide for his version of events is an imprecise statement by the Government at a very early bail hearing and a series of conversations with Mr. Dratel and Mr. Greenberg that took place months after the events at issue.  Ivezaj suggests that in order to discredit his account, the Court must also discredit the testimony of these respected lawyers.  There is no need to do that.

In none of the conversations that followed the verdicts in 2006 did the attorneys take the time to reconstruct precisely what Ivezaj and Mr. Rubenstein had discussed in August 2005.[8]

---

[8] Such a careful reconstruction would have been a necessary predicate to any ineffective-assistance-of-counsel claim, and Mr. Greenberg chose not to pursue one.

Although Mr. Rubenstein had faxed to Mr. Greenberg his five pages of Sentencing Guidelines calculations recording the Government's plea offer and his own assessment, they did not study them together, discuss which of the numbers reflected the Government's offer and its calculation of Ivezaj's sentencing exposure, reconstruct on what ground any prediction of a 13-year sentence could have been or was based, or explore the impact of the § 924(c) count on any analysis, much less on the advice Mr. Rubenstein had rendered to Ivezaj. Without such a careful reconstruction, Mr. Rubenstein could not have and, indeed, did not confess error. His remark that he was a "stand-up guy" was no more than an expression of loyalty to Ivezaj and a commitment to take responsibility in the event it were determined that his pre-trial assessment of Ivezaj's sentencing exposure was erroneous. But he urged Mr. Greenberg to give serious consideration to the Sentencing Guidelines arguments that, before trial, he had outlined to Ivezaj in order to demonstrate that the Government's offense-level calculations were aggressive. As it turned out, at sentencing the Court concluded that Ivezaj's OL was 35: the same baseline that Mr. Rubenstein used in advising Ivezaj about his potential Guidelines range. Moreover, Mr. Greenberg adopted each of Mr. Rubenstein's

43

sentencing arguments in an effort to persuade the Court that a
lower OL was appropriate.

On the stand at this hearing, each of the attorney-
witnesses struggled with the difficulty of remembering in 2012
what was said in 2006 about events that had transpired in 2005.
They tried to distinguish between what they clearly remembered
and what they believed had happened.  They examined handwritten
lists of numbers and scrawled, incomplete phrases in an effort
to refresh their recollections.  Although their accounts of what
transpired were vague and, in some cases, internally
inconsistent, Messrs. Dratel, Greenberg, and Rubenstein each
gave honest testimony in an effort to be of assistance to the
Court.  Considering all of that testimony, Ivezaj has failed to
sustain the "heavy burden" he bears in seeking to set aside his
conviction on the ground of ineffective assistance of counsel.
See United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004).
Contrary to Ivezaj's claim, the record does not compel the
conclusion that Mr. Rubenstein told him that he faced, at most,
only thirteen years (or thirteen more years) in prison if
convicted on all counts, including the gun count.  Rather, on
balance, the evidence that can be retrieved at this late date --
more than six-years after the events in question took place --
strongly indicates that Rubenstein fully advised his client of

44

the strength of the Government's case and the awesome sentencing consequences he would face if convicted.[9]  Ivezaj's claim therefore fails.

Even if Ivezaj were able to show that Mr. Rubenstein's performance was constitutionally deficient, which he cannot do, his ineffective assistance claim would still founder on Strickland's second prong.  Ivezaj has not shown that "but for the ineffective advice of counsel there is a reasonable probability that . . . [he] would have accepted the plea." Lafler, 2012 WL 932019, at *5.  To the contrary, the very evidence that makes it incredible that Mr. Rubenstein advised Ivezaj that he faced a sentence of at most thirteen years also undercuts Ivezaj's claim that he would have accepted the Government's guilty plea if he had known his true sentencing

---

[9] Ivezaj does not claim that Mr. Rubenstein provided ineffective assistance to him by inaccurately predicting the likelihood that the Government would convict him and his co-defendants on the § 924(c) count.  All of the trial attorneys who testified at the hearing explained that the defendants were far more sanguine than their attorneys regarding their chances of acquittal at trial.  As Mr. Rubenstein noted at the hearing, "You never say in this courthouse or any federal courthouse that the Government's argument is weak.  Okay?  They win a lot of the time."  The defendants, however, did not believe that the witnesses would appear at trial to testify against them.  Since the defendants had defended and expanded their territory and committed their crimes through violence, threats of force, and by instilling fear, their optimism in this regard is easy to understand.

exposure.  Irrespective of anything Mr. Rubenstein might have
told him, Ivezaj had ample notice -- from the Court, from the
Government, from his co-defendants and from their lawyers --
that there was a possibility that he would be sentenced to a
term of imprisonment substantially longer than the one
contemplated by the plea offer, and, indeed, longer than the
22-year sentence that he received.  Yet, despite this fact,
Ivezaj did not seriously consider the August 2005 plea offer
and, indeed, became angry upon learning of its terms.  The
record is clear: Ivezaj had resolved that, unless he could
secure an offer in the five- to six-year range, he would take
his chances at trial in the hope that Hirakis or some other key
witness would fail to appear.  Nothing Mr. Rubenstein could say
would have caused him to waiver from this position.  Because
Ivezaj has failed to carry his burden on either prong of the
Strickland standard, the February 28, 2011 motion to vacate his
sentence is denied.

II.  Dedaj and Colotti

Unlike Ivezaj, Dedaj and Colotti do not claim that counsel
provided inaccurate advice in the context of their plea
discussions with the Government.  Rather, they both assert that
they did not learn that any plea offer had ever been extended to
them until well after they were convicted at trial.  As noted

46

above, a lawyer has a duty to advise his client of any plea offer that the Government extends; failure to do so constitutes ineffective assistance of counsel. Frye, 2012 WL 932020, at *8; Pham, 317 F.3d at 183. The claims of Dedaj and Colotti that their trial counsel failed in this regard lack all credibility.

Even before turning to the evidence regarding counsel's performance, however, it should be noted that Dedaj's effort to show that he was prejudiced by the supposed failure of his lawyer, Mr. Kulcsar, to convey the Government's plea offer is undercut in important respects by the claims that Ivezaj and Colotti make in their own petitions. As outlined above, Ivezaj learned of his plea offer at roughly the same time that the Government made an offer to Dedaj through Mr. Kulcsar. The Government provided the terms of the offers it was extending to Dedaj, Ivezaj and Lelcaj to all three lawyers who attended the August 9 meeting and they, in turn, conveyed this information to their clients. The trial defendants as a group were thus well aware of which of them had received offers and on what terms. This conclusion is confirmed by Colotti's pro se petition for habeas corpus, which twice made reference to the fact that Dedaj had been offered a favorable plea by the Government. On page 21 of his petition, Colotti asserted that the Government extended plea offers to four of the six defendants who proceeded to

47

trial, the implication being that only Colotti and Rudaj did not receive offers. Later, on page 31 of the same document, Colotti asserted that "the Government extended plea offers to 26 of the 28 defendants arrested" in the case. Dedaj thus knew of the Government's plea offer and failed to take steps to accept it.

The reasons for which Dedaj elected to proceed to trial are clear from the record and only underscore the point that neither he nor Colotti can satisfy Strickland's second prong. The petitioners were adamantly opposed to accepting any plea in the range that the Government was willing to offer. As Colotti told Mr. Tacopina on one occasion, he would rather "take it like a man" and serve a stiff prison term than plead guilty to the charges against him. He did not make this comment lightly. The defendants were all well aware that they were facing potentially enormous sentences, not only due to the seriousness of the racketeering allegations but also because of the mandatory seven-year consecutive term that would result from a conviction on the gun charge. Yet, despite the warnings of their lawyers that the Government's case was strong and that pleading guilty promised to bring the most favorable outcome, the defendants remained sanguine about their chances at trial. They had concluded that Hirakis and other key witnesses would be too intimidated to appear and testify at trial and that, at the end

48

of the day, the Government's view of the case was overblown.
Emblematic of this attitude was Colotti's reaction to the
Government's offer of a plea that would carry a potential prison
term of 17.5-22 years.  Mr. Tacopina testified that when he
presented the offer to Colotti, Colotti laughed at it and made
clear that it wasn't something he was interested in.  Although
Dedaj was slightly more open to the possibility of a plea, he
too felt that the case reduced to the gambling allegations and
that the Government had an overly optimistic view of both the
strength of its evidence and the sentences it was likely to
secure at trial.  Ultimately, as he told Mr. Kulcsar, Dedaj saw
no value in accepting a plea offer that would leave him in
prison for the rest of his son's adolescence.  Indeed, with the
exception of Lelcaj, who was offered a dispensation due to his
immigration problems, the defendants seem to have concluded that
their best strategy was to band together and take their chances
at trial.  The core of their business was gambling, and they
concluded that they faced better odds rolling the dice at trial
than accepting anything that was on offer from the Government.

Not only are Colotti and Dedaj unable to demonstrate any
prejudice from the alleged failure of their lawyers to inform
them of the Government's plea offers, but the allegations of
deficient performance are themselves incredible.  As an initial

49

matter, the very same evidence that renders implausible the petitioners' claims that they were prejudiced by their lawyers' supposed ineffectiveness also cuts against their assertions that they were never told of the Government's plea offers.  As noted above, the defendants as a group were well aware of the offers that the Government had extended to each of them.  In Dedaj's case, the record clearly demonstrates that the terms of his offer were communicated not only to his own lawyer, Mr. Kulcsar, but also to Mr. Rubenstein and Ms. Edwards.  It is inconceivable that either Mr. Kulcsar or Mr. Tacopina would run the considerable risk -- both personal and reputational -- of failing to disclose a plea offer to his client in circumstances such as these, where there was a substantial likelihood that the client would learn of the offer from some other source.  Nor does it make sense that the two lawyers, neither of whom felt that he was being adequately compensated during the long and arduous trial, would fail to communicate information, such as a plea offer, that could resolve the case in a more expedient fashion.

Finally, and most importantly, both Mr. Tacopina and Mr. Kulcsar testified credibly and in detail about the communications they had with their clients about the Government's offers and the circumstances that led to the

rejection of those offers.  In particular, Mr. Tacopina and his associate, Mr. Vomvolakis, provided a vivid account of their heroic efforts to encourage Colotti seriously to consider the Government's plea offer, to no avail.  The petitioners' claims that, after working diligently to secure plea offers for their clients, Mr. Tacopina and Mr. Kulcsar then failed to communicate those offers defy common sense and are not believable. Accordingly, the petitions of Colotti and Dedaj are denied.

CONCLUSION

For the forgoing reasons, the three petitions are denied in their entirety.  In addition, the Court declines to issue a certificate of appealability as to Ivezaj, Dedaj or Colotti. The petitioners have not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted.  Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005). The Court also finds pursuant to 28 U.S.C. § 1915(a)(3) that any

appeal by the petitioners from this Order would not be taken in good faith.  Coppedge v. United States, 369 U.S. 438, 445 (1962).

SO ORDERED:

Dated:   New York, New York
         April 4, 2012

_____
                    DENISE COTE
           United States District Judge